# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

| | |
|---|---|
| JAMES EARL CLINTON, | ) |
| Plaintiff, | ) |
| | ) CAUSE NO. 3:10-CV-467 PS |
| vs. | ) |
| EDWIN BUSS, *et al.*, | ) |
| Defendants. | ) |

## OPINION AND ORDER

In November 2009, James Earl Clinton, a prisoner confined at the Miami Correctional Facility ("MCF"), injured his left knee playing basketball. For the next two years, MCF medical staff treated Clinton for his injury. Correctional Medical Services ("CMS") is a private company that provides medical care to inmates. After screening the complaint and dismissing a number of defendants pursuant to 28 U.S.C.§ 1915A, I allowed Clinton to proceed against CMS employees Frye, Cummings, Myers, and Townsend on his Eighth Amendment claim that they were deliberately indifferent to his serious medical needs. [DE 7] I also allowed the case to proceed against two of the MCF staff members, Correctional Officer Cathy Hanselman and Case Manager Joyce Holland. *Id.*

The state defendants – Hanselman and Holland – moved for summary judgment on the ground that Clinton failed to exhaust his administrative remedies before filing suit [DE 45], which I granted in part and denied in part [DE 61]. I granted it as it related to Defendant Hanselman, but denied it as to Defendant Holland. The case is now before me on summary judgment on the merits brought by both the CMS employees and by Holland. [DE 79; DE 83].

Summary judgment must be granted when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine issue of material fact exists, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003).

**FACTUAL BACKGROUND**

<u>Facts Relating to Clinton's Knee Injury and Subsequent Treatment</u>

Clinton already had a problem with his knees when he arrived at the MCF [DE 86-3 at 4]. He submitted a health care request on July 16, 2009, stating that he had been seeing a doctor for seven years for his knees, and that his problems are "not getting any better since I have been having to jump down from this bed" [*Id.*]. Subsequently, he told a prison doctor that he had problems with a right ruptured knee quadriceps tendon since 2002 [DE 86-3 at 6]. In November 2009, Clinton's knee problems got much worse when he injured his left knee playing basketball and was taken to the Wishard Memorial Hospital Emergency Room [DE 86-3 at 13-14; DE 86-18 ¶ 4], where he was diagnosed as having a quad tendon rupture [DE 86-19 at 4]. The following day, Nurse Snyder examined Clinton and gave him a pass for ice, crutches and a knee brace [DE 86-3 at 24-25]. A few days later, Nurse Myers examined Clinton, reviewed his discharge papers from Wishard, and submitted a consultation request to send Clinton back to Wishard for an orthopedic evaluation, per the recommendation of the emergency room doctor [DE 86-3 at 26-29; DE 86-18 ¶ 5].

Thereafter, followed up with Wishard Memorial Hospital and confirmed Clinton's diagnosis of a possible tendon rupture [DE 86-3 at 30; DE 86-15 ¶ 5]. On November 17, 2009,

2

Nurse Myers reviewed Clinton's x-ray results and submitted a consultation request for an MRI of his left knee [DE 86-4 at 1-4; DE 86-18 ¶ 6]. She noted that an MRI was warranted because the x-ray could not confirm whether the injury was acute or chronic and that Wishard had recommended the MRI [*Id.*]. Dr. Michael Mitcheff asked Nurse Myers to conduct a full knee exam [DE 86-4 at 4-6; DE 86-18 ¶ 6]. She examined Clinton on November 18, 2009, and noted several problems with his knee including that his patella was very unstable and could be moved laterally [DE 86-4 at 7; DE 86-18 ¶ 6].

On November 25, 2009, Clinton had an MRI of his left knee, which showed rupture of the quadriceps tendon [DE 86-4 at 10-11; DE 86-18 ¶ 6]. On December 18, 2009, Nurse Myers referred Clinton for ten physical therapy sessions, since surgery had not been recommended by Wishard [DE 86-4 at 13; DE 86-18 ¶ 6]. She noted that Clinton could bear full weight with no pain but had some pain with flexing the knee and that while Clinton could walk without crutches, he felt safer with them [DE 86-4 at 15].

On December 26, 2009, Clinton reported that his knee had buckled while in the shower [DE 86-4 at 17]. Nurse Townsend examined Clinton, who rated his pain a 5 out of 10 [DE 86-4 at 18]. Nurse Townsend noted that Clinton did not have any redness, swelling, bruising, or increased warmth to the area, that he was not in any distress, and that he did not have any obvious injury, so she told him to follow up after 7 days if his symptoms worsened [*Id.*].

On January 9, 2010, Clinton was seen in sick call for complaints of knee pain; he claimed that his knee was hyper-extending because of the snow and ice, and in response, medical staff gave him a wheelchair pass for two weeks, a crutches pass, and a knee sleeve to use for one month [DE 86-4 at 20-24]. Three days later, Nurse Myers submitted a request for an orthopedic consultation for possible surgical repair of Clinton's ruptured tendon, based on his physical

3

therapist's recommendation [DE 86-4 at 25-27; DE 86-18 ¶ 8].

On January 21, 2010, Dr. Lambertson examined Clinton and gave him Vicodin for pain control while he awaited his appointment with the orthopedic specialist [DE 86-4 at 28], and that prescription was renewed a week later. [DE 86-5 at 2]. Clinton returned to Wishard Hospital and was diagnosed with a tendon rupture, for which the Wishard doctor recommended surgery. [DE 86-19 at 4-5 and 10; DE 86-5 at 3-7]. On February 3, 2010, Nurse Myers requested orthopedic surgery to repair Clinton's tendon [DE 86-5 at 8-9; DE 86-18 ¶ 8]. In the meantime, while Clinton was awaiting surgery, Dr. Lambertson examined Clinton and noted that the orthopedist at Wishard was to let her know what type of knee brace she should order for the right knee [DE 86-5 at 10]. Clinton reported that the pain medication was controlling his pain [*Id.*].

Clinton was admitted to Wishard on March 19, 2010 for quadriceps reconstruction surgery on his left knee; he was discharged on March 22, 2010, and was ambulating with crutches [DE 86-5 at 13-23; DE 86-19 at 6-10 and 13-24]. On March 23, 2010, Clinton was examined by Dr. Lambertson, who admitted him to the infirmary because he was in a mid-thigh cast and had trouble moving around in his cell [DE 86-5 at 30]. Dr. Lambertson also prescribed Vicodin for pain [DE 86-6 at 1]. Nurse Myers examined Clinton on March 30, 2010, and noted that his pain was moderately controlled with Vicodin, that he was getting up in a wheelchair, and that he did not have a fever [DE 86-6 at 16]. A few days later, Clinton had an appointment at Wishard, where he was placed in a hinged knee brace locked in extension and was told to do physical therapy for heel slides and patella mobilization, and to return in four to five weeks [DE 86-6 at 29; DE 86-7 at 2].

Clinton was also prescribed Vicodin for pain, with a start date of March 22, 2010, and a stop date of April 6, 2010 [DE 86-7 at 3]. Dr. Noe Marandet examined Clinton on April 8, 2010,

4

and prescribed Vicodin and Naprosyn for pain [DE 86-7 at 14 -15].

On April, 13, 2010, Nurse Myers saw Clinton and submitted a consultation request for 14 physical therapy sessions [DE 86-18 ¶ 8]. Nurse Myers saw Clinton again on April 20, 2010, at which time his left knee was no longer warm compared to the right and his swelling had improved [DE 86-8 at 6; DE 86- 18 ¶ 8]. On May 13, 2010, Dr. Marandet examined Clinton and ordered an x-ray [DE 86-9 at 1]. On May 17, 2010, Dr. Lambertson examined Clinton, and noted that the previous week, Clinton had a papule on his right knee so Dr. Lambertson increased Clinton's antibiotics and ordered a wound culture [DE 86-9 at 3-4]. The next day, the pathology report came back on the wound culture and showed a MRSA infection [DE 86-9 at 5]. Nurse Myers saw Clinton that day and noted that his knee infection was improving [DE 86-9 at 7; DE 86-18 ¶ 8]. Dr. Marandet ordered more antibiotics on May 23, 2010 [DE 86-9 at 9-11]. Clinton continued physical therapy between May 24 and June 7, 2010 [DE 86-9 at 12, 18-20, 22, 25, and 28]. On June 7, 2010, the medical staff determined that Clinton was stable enough to return to general population with a bottom bunk, a wheelchair for long distances, and crutches for short distances [DE 86-9 at 26]. On June 8, 2010, Mr. Clinton was discharged from the infirmary to a handicapped cell [DE 86-9 at 27 and 29].

On June 14, 2010, Clinton had physical therapy and it was determined that he no longer needed a wheelchair [DE 86-10 at 5-6]. Dr. Mitcheff examined him and noted that he had good range of motion, and requested additional physical therapy sessions [DE 86-10 at 9]. Clinton returned to Wishard on June 17, 2010, and reported doing well and having minimal pain [DE 86-10 at 10-13]. The Wishard doctor discontinued Clinton's leg brace but continued physical therapy [*Id*.]. On June 18, 2010, Dr. Marandet examined Clinton and ordered a wheelchair, a bottom bunk and crutches for 180 days [DE 86-10 at 15-16 and 18]. Clinton returned to Wishard

on September 16, 2010 for a follow-up with the orthopedist [DE 86-12 at 3-4]. Dr. Marandet again examined Clinton on November 4, 2010, noted that he had good range of motion, and gave him a Prednisone dose pack [DE 86-12 at 14-15]. In all, Clinton had physical therapy on twenty-four occasions between June 18 and November 12, 2010 [DE 86-10 at 19-30; DE 86-11 at 1-25, 27-28; DE 86-12 at 8-13, 16-19]. On November 12, 2010, the physical therapist noted that Clinton had met all of his goals and he was released to a home exercise program [DE 86-12 at 18].

Facts Relating to Case Manager Holland and Clinton's Bunk Assignment

On July 22, 2010, Clinton told Case Manager Joyce Holland that he had a serious knee surgery in March 2010, and that he had a number of medical passes, including a bottom bunk pass [DE 100-2 ¶ 6]. On September 14, 2010, Holland inadvertently authorized moving Clinton from a bottom bunk to a top bunk [DE 79-1 ¶ 12]. Though Dr. Marandet had ordered a bottom bunk pass for Clinton for 180 days beginning on June 18, 2010, when Holland checked the inmate database, there was no record of the pass, and so Holland approved the move [*Id.*]. Later that day, Clinton complained about the move and got into an altercation with prison staff [DE 79-3 at 2]. As a result, he was moved to a segregation unit before he was actually moved to the top bunk, and the segregation unit did not have any top bunk beds. [*Id.* ¶ 15].

**DISCUSSION**

Clinton alleges that the Defendants subjected him to cruel and unusual punishment in violation of the Constitution's Eighth Amendment. A violation of the Eighth Amendment's cruel and unusual punishments clause consists of two elements: (1) objectively, whether the injury is sufficiently serious to deprive the prisoner of the minimal civilized measure of life's necessities, and (2) subjectively, whether the prison official's actual state of mind was one of "deliberate indifference" to the deprivation. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*,

501 U.S. 294, 298 (1991).

The Eighth Amendment requires the government "to provide medical care for those whom it is punishing by incarceration." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir.1996) (*cert. denied,* 519 U.S. 1126 (1997)) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). In medical cases, the Eighth Amendment test is expressed in terms of whether the defendant was deliberately indifferent to the plaintiff's serious medical needs. *Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007); *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). A medical need is "serious" for Eighth Amendment purposes if it is either one that a physician has diagnosed as mandating treatment, or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Gutierrez,* 111 F.3d at 1373.

Deliberate indifference is comparable to criminal recklessness, and is shown by "something approaching a total unconcern for [the plaintiff's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992) (citations omitted). "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.

According to the amended complaint, on July 22, 2010, Clinton informed Case Manager Joyce Holland that he needed a bottom bunk because of his knee injury [DE 3 at 13]. At that time, Clinton was already assigned to a bottom bunk. Clinton alleges that on September 14, 2010, however, Defendant Holland "had Petitioner moved and forced into an unsafe situation 'a top bunk'" [*Id.*]. He further alleges that he suffered "<u>pain</u>, <u>suffering</u>, <u>mental anguish</u>, and <u>duress</u> by Mrs. Joyce Holland's <u>negligence</u> and <u>deliberate</u> <u>indifference</u> toward . . . [his] . . . medical conditions" [*Id.* at 14] (emphasis in original). Clinton asserts that he spoke with Defendant Holland later and she told him "that she resubmitted the bed move to a bottom bunk afer she was

7

reminded by a Sgt. Clothier" of Clinton's problems [*Id.*].

Defendant Holland argues that Clinton's claims do not meet the Eighth Amendment's subjective standard because she was not deliberately indifferent to his serious medical needs, and that his claims do not meet the Eighth Amendment's objective standard because he suffered no actual injury from being assigned to a top bunk since he never had to sleep in a top bunk. In her declaration, Defendant Holland states that on September 14, 2010, she "authorized a bed move for the Plaintiff," but that before doing so she checked the inmate "database" and found that Clinton "was not in the database to be housed in a bottom bunk and I knew of no independent reason why he could not be assigned to a top bunk" [DE 79-1 ¶ 12]. Later that day, she learned "that the Plaintiff complained about the move. In order to defuse the situation, I began to look for a bottom bunk for the Plaintiff without regard to whether he had a valid request from the medical department for a bottom bunk" [*Id.* ¶ 14]. But before Defendant Holland could complete her search for an available bottom bunk for Clinton, correctional officers moved him to a segregation unit due to misbehavior [*Id.* ¶ 15].

Clinton's medical records make it clear that on June 18, 2010, a doctor ordered that he have a bottom bunk for 180 days [DE 86-10 at 18], but Defendant Holland's declaration establishes that she did not find that order in the database she accessed when she authorized the September 14, 2010 bed move [DE 79-1 ¶ 12]. Clinton states in an affidavit that on July 22, 2010, he "did alert case manager Ms. Joyce Holland of my serious knee surgery that took place on March 22, 2010, as well as all valid bunk, range, wheelchair, paperwork" [DE 100-2 ¶ 6]. But a serious medical problem in July would not by itself alert Defendant Holland that he still had the same degree of medical problems or need for a bottom bunk in September, and "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane

8

conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Accordingly, even assuming that Clinton suffered harm from the order to move him to a bottom bunk, because she did not know, at the time that she approved the move, that doing so would put Clinton's safety at an excessive risk, it appears that Defendant Holland lacked the requisite subjective intent to harm him.

But even more to the point, it is clear from the record that the top bunk assignment never took effect because Clinton got into a verbal confrontation with correctional officers and as a result they moved him to a lockup unit where he had a lower bunk. Clinton alleges in his amended complaint that his assignment to a top bunk "could" have caused him "more serious injuries" [DE 3 at 14], but he has provided no evidence that his fear of injury ripened into an actual injury. And that is what he would need to show. *Doe v. Welborn*, 110 F.3d 520, 523 (7th Cir. 1997). Because Clinton does not suggest that he suffered any actual harm from Holland's mistaken assignment of him to a top bunk, he does not meet the objective component of the *Farmer* test.

Clinton does allege that non-defendant correctional officers injured his leg when they took him to the segregation unit on September 14, 2010: in his affidavit, Clinton states he was "reinjured by the staff officers forcing him up the segregation stairs . . ." [DE 78 ¶ 9]. But Section 1983 creates a cause of action for damages based on personal liability; a plaintiff must show the defendant's personal involvement or participation, or direct responsibility for the conditions of which he complains. *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986). "Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009); *Moore v.*

*Indiana*, 999 F.2d 1125, 1129 (7th Cir. 1993). Because Defendant Holland had no personal involvement in this incident, she is not responsible for injuries that non-defendant correctional officers may have inflicted on Clinton. Accordingly, Defendant Holland's motion for summary judgment [DE 79] is **GRANTED**.

The next issue to take up is the other pending motion for summary judgment, the one brought by the CMS employees. Those defendants have submitted Clinton's medical records, set out in detail above, which establish that Clinton received extensive and appropriate medical treatment for his knee injury over an extended period of time, including reconstructive surgery and lengthy physical therapy. Clinton does not make comprehensive allegations that the treatment he received was inadequate or ineffective, or that all of the medical personnel he dealt with at the MCF and at Wishard were deliberately indifferent to his needs. Instead, he brings a series of very specific claims against the four nurses about various actions they took along the way which he says shows indifference to his serious medical needs.

In his amended complaint, Clinton asserts that he was seen at Wishard Hospital on the day he injured his knee playing basketball, and that a Wishard doctor "instructed the MCF medical staff to call Wishard Medical Center on 11/9/2009 to set date to be seen by an orthopedic examiner concerning repair of my (tendon rupture)" [DE 3 at 4], which Clinton's medical records confirm [DE 86-3 at 15]. Clinton alleges that Nurse Lynn Frye, the MCF Health Services Administrator, was deliberately indifferent to his serious medical needs by not setting an immediate date for him to return to Wishard for a followup examination. Clinton states in his amended complaint that he alerted Nurse Frye's "office several times to discuss the seriousness of my urgent need of surgery for my tendon rupture" but that he did not obtain a timely order to

return to Wishard to see an orthopedic specialist [DE 3 at 4].

According to the defendants, Nurse Frye's job as Health Services Administrator includes ordering medical supplies for the facility, hiring nursing staff, maintaining the nursing staff schedule, and dealing with human resources issues for the medical staff [DE 86-2 ¶ 4]. But she seldom becomes involved in treating inmates, and she never was involved in rendering medical care to Clinton [*Id.*]. Nurse Frye states in her affidavit that she also has no involvement in determining whether inmates need to be seen by an outside specialist, or need to be sent for outside testing, and she had no involvement in determining whether Clinton would be sent to Wishard or when he would be sent there [*Id.* ¶ 7].

Clinton has submitted his own affidavit, in which he states that on August 8, 2010, he "did request the medical director Ms. Lynn Frye office concerning the improper medical care of her staff" [DE 78 ¶ 10] and that "on Oct. 31st 2011 you were requested once again Ms. Lynn Frye concerning the refusal of therepy [sic] treatment by nursing staff" [*Id.* ¶ 11] (emphasis in original). Clinton's statement, dealing with events occurring in 2011, long after the amended complaint was filed, is not relevant to the issues presented in the amended complaint. Clinton's statement that he wrote to Nurse Frye on August 8, 2010, about the actions of other nurses, has no bearing on whether or not she was deliberately indifferent to his serious medical needs by failing to ensure that he be returned to Wishard Hospital in November 2009.

Nurse Frye has stated under oath that she was not responsible for determining whether Clinton would be sent to Wishard to see an orthopedic specialist or when he would be sent, and Clinton has not provided admissible evidence contesting that assertion. So there is simply no evidence that Nurse Frye was deliberately indifferent to his serious medical needs by failing to ensure that he returned to Wishard within a week of his initial injury. Quite simply, it wasn't her

11

responsibility.

While Nurse Frye was not involved in returning Clinton to Wishard for a second examination, Clinton's medical records establish that on November 11, 2009, within a week of when he was first seen at Wishard, another nurse — Nurse Myers — submitted a consultation request for Clinton to return to Wishard [DE 86-3 at 26-27]. Clinton's return to Wishard for a second evaluation was delayed because a non-defendant doctor required Nurse Myers to resubmit the consultation request after gathering more information [DE 86-18 ¶¶ 5-6]. Clinton was sent for an orthopedic consultation on January 28, 2010, and the consultant recommended a left quad tendon repair [DE 86-18 ¶ 8]. Nothing in the record suggests that the delay in Clinton returning to Wishard to see the orthopedic consultant was the result of deliberate indifference on the part of anyone.

Nurse Karen Cummings is the Director of Nursing at the MCF. Clinton alleges that on December 16, 2009, he wrote to Nurse Cummings complaining about lack of treatment "by her nursing staff," but that he never got a response [DE 3 at 5]. He further alleges that he filed a grievance against Nurse Cummings, who responded that he "could submit a pink slip request to her office . . . and she will review my concerns" [*Id.*], but that she never responded to the pink slip he submitted. Clinton alleges that Nurse Cummings showed "negligence and unprofessional acts" toward him [*Id.*].

According to the medical defendants, Nurse Cummings's job as the Director of Nursing is to oversee the nursing staff, both administratively and with regard to their treatment of inmates [DE 86-20 ¶ 4], and to help inmates informally resolve disputes or complaints about the nursing staff [*Id.* ¶ 6]. Nurse Cummings states in her affidavit that she received a request for interview from Clinton on January 7, 2010, in which he stated that he wanted to discuss his knee pain that

he claimed he was having since his fall in the shower on December 26, 2009 [*Id*.]. That document is contained in Clinton's medical records [DE 86-4 at 22]. Clinton asserts that Nurse Cummings did not respond to his request for interview, but Nurse Cummings states that in response to that request for interview, Clinton was scheduled to see a nurse in nursing sick call for treatment of his knee pain [DE 86-20 ¶ 6]. The medical record establishes that Clinton was in fact seen on sick call on January 9, 2009 [DE 86-4 at 23-24]. Accordingly, Clinton's allegation that Nurse Cummings ignored his requests is belied by the written record.

In his affidavit, Clinton states that on November 26, 2011, he "requested Ms. Karen Cummings office concerning the problems with her nursing staff assisting Mr. Clinton with a wheelchair and he was refused by Ms. Cummings" [DE 78 ¶ 12], and that on April 28, 2012, a nurse retaliated against him by throwing medication at him "through the OSB medical window pickup, and Ms. Cummings still refused to respond" [DE 78 ¶ 13]. Both of these incidents, however, occurred after Clinton filed his amended complaint, and they have no bearing on the claims presented in the amended complaint.[1]

In his amended complaint, Clinton does not allege that Nurse Cummings was personally involved in his medical treatment or that she personally deprived him of adequate medical care or treatment. He only alleges that he made her aware of problems he believed he was having with other nurses. But even if Clinton made Nurse Cummings aware of problems he was having with other nurses, and she did not intervene, that does not make her liable for damages under

---

[1]To the extent that Clinton is trying to amend his complaint to include these incidents at this stage of the game, he cannot. *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) ("a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). Moreover, Clinton has already tried this tack and failed: these allegations were the subject of Clinton's previously unsuccessful motion to amend his complaint a second time, which was denied [DE 88].

Section 1983. "Only persons who cause or participate in the [Constitutional] violations are responsible" for those violations; failure to investigate or ruling against a prisoner's grievance "does not cause or contribute to the violation." *George v. Smith*, 507 F.3d. 605, 609 (7th Cir. 2007) (citations omitted). Quite simply, Nurse Cummings' behavior here does not rise to the level of deliberate indifference: a prison official who receives complaints about medical care from a prisoner and arranges for others on staff to examine the prisoner is entitled to summary judgment on a deliberate indifference claim. *Greeno v. Daley*, 414 F.3d 645, 657 (7th Cir. 2005) (inmate complaint examiner who responded to complaints by speaking to appropriate members of health services unit about the plaintiff was not deliberately indifferent and entitled to summary judgment). Here, Nurse Cummings received Clinton's request and had him seen by a nurse within two days. Accordingly, Nurse Cummings is entitled to summary judgment.

Clinton has also presented specific allegations of deliberate indifference against Nurse Myers, which apparently formed the basis for his December 16, 2009, letter to Nurse Cummings complaining about lack of treatment "by her nursing staff" [DE 3 at 5]. In his amended complaint, Clinton alleges that he saw Nurse Myers on November 9, 2011, and that she told him she had "no information advising them about a orthopedics appointment or anything about . . . [his] . . . serious injuries" [DE 3 at 6]. He further alleges that on November 11, 2009, he was seen again by Nurse Myers, at which time she "voiced [an] objectionable insult 'I had no business playing basketball,' and continued to express her aversion, telling me 'she will see me when she gets to it,' she finished her unprofessional vindictiveness by stating she don't have to make a appointment for me to be seen by any kind of doctor, I was ordered to depart (leave) . . . without any kind of medication to relieve the excruciating pain and suffering I was undergoing" [DE 3 at 7].

14

In her affidavit, Nurse Myers states that she first saw Clinton on November 11, 2009, and that later that day she "submitted a consultation request to send Mr. Clinton back to Wishard Hospital for an orthopedic evaluation" [DE 86-18 ¶ 5]. As noted above, that request was delayed because Dr. Person (who is not a defendant) asked Nurse Myers to obtain more information about Clinton's condition, which she did [*Id.*]. Nurse Myers further states that she and the other medical staff at the MCF have no control over when Wishard will schedule inmates for appointments; inmates "are scheduled for appointments according to when the outside provider has an opening in their schedule" [*Id.* ¶ 9].

Clinton's first claim against Nurse Myers is that she saw him on November 9, 2009, and told him that she had "no information advising them about a orthopedics appointment or anything about . . . [his] . . . serious injuries" [DE 3 at 6]. In her affidavit, Nurse Myers states that the first time she saw Clinton was on November 11, 2009 [DE 86-18 ¶ 5], and his medical records do not reflect that he was seen on November 9, 2011, by any of the nursing staff. The medical records do establish that Clinton was seen by Nurse April Snyder on November 7, 2009 [DE 86-3 at 25].

Clinton does not address this claim in his affidavit or contest Nurse Myers's sworn statement that the first time she saw him was on November 11, 2009. In any event, even if Nurse Myers or Nurse Snyder saw Clinton within a couple of days after he returned from the Wishard emergency room and told him that she had no information about his injuries or an orthopedics appointment, it would not constitute deliberate indifference to his serious medical needs; it would simply reflect a lack of information shortly after his initial injury.

The Plaintiff's second claim deals with his interaction with Nurse Myers on November 11, 2009. Nurse Myers agrees that she met with Clinton on that date, and the medical records confirm that she saw him that day. The record of the provider visit on November 11, 2009, states

15

in part that "Today [patient] is angry and threatening due to not being sent to WH ortho on Monday. [Patient] denies severe pain, is in leg stablizer [sic] and on crutches" [DE 86-3 at 28]. Clinton's specific complaint is that Nurse Myers insulted him that day by stating that he had no business playing basketball on his troublesome knees, against younger men. There is "a *de minimis* level of imposition with which the Constitution is not concerned," *Ingraham v. Wright*, 430 U.S. 651, 674 (1977), and verbal abuse and harassment are not sufficient to state a claim under Section 1983. *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987); *Oltarzewksi v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987).

This claim is a trifle. Perhaps a medical professional ought not advise a middle-aged man with a seven year history of knee problems that he should not be playing basketball against much younger competition, but it seems like wise advice to me. But in all events, it's a *de minimus* level of "harassment" – if it's that at all.

Clinton next alleges that Nurse Myers told him on November 11, 2009, that she did not have to make a appointment for him to be seen by an orthopedic examiner. But this too is a trifle since the record is clear that Clinton did, in fact, initiate paperwork that very day for him to be seen by an orthopedic specialist at Wishard [DE 86-3 at 26]. So even if Nurse Myers told Clinton that she did not have to initiate paperwork for him to return to Wishard, the fact that she did initiate the paperwork for him to return to Wishard establishes a lack of deliberate indifference to his serious medical needs.

Clinton further alleges that Nurse Myers left him in a lurch on November 11, 2009 "without any kind of medication to relieve the excruciating pain and suffering I was undergoing" [DE 3 at 7]. But the medical records reveal that Clinton "denied severe pain" when he met with Nurse Myers that day [DE 86-3 at 28]. But more to the point, the medical records establish that

Clinton *was already on pain medication* by that day which had been prescribed by a doctor with a start date of November 7, 2009, and a stop date of November 14, 2009 [DE 86-3 at 30].

Finally, although he does not raise the claim in his amended complaint, Clinton states in his affidavit that Nurse Myers showed deliberate indifference when she ordered him to leave without a wheelchair [DE 78 ¶ 2]. The problem with this claim is that Clinton's medical records reflect that on November 7, 2009, he had been prescribed crutches to help him move about [DE 86-3 at 24]. Clinton suggests that he would liked to have had a wheelchair because of the possibility of ice on the ground, but he does not allege that he suffered any actual harm from not being given a wheelchair on November 11, 2009. *Welborn*, 110 F.3d at 523 (to establish liability under Section 1983, "the defendant must breach a duty owed to the plaintiff, who must suffer cognizable legal harm"). Absent a showing that he actually suffered harm from Nurse Myers not giving him a wheelchair, Clinton's claim against her fails.

The final claims brought by Clinton against the medical defendants relates to defendant Sharrie Townsend. Townsend is the nurse who saw Clinton on December 26, 2009, after he fell in the shower and re-injured his left knee. He alleges that Nurse Townsend "right out <u>Refused</u> me the proper medical care at that time" by not issuing an order that he be given a wheelchair [DE 3 at 8] (emphasis in original). But the medical records belie that assertion; the records show that Townsend took Clinton's vital signs, found them to be normal except for slightly elevated blood pressure, and that she physically examined him [DE 86-4 at 18]. In doing so she noted that he was not in any acute distress, and that his knee was not red, swollen, warm, or bruised [*Id.*]. She told Clinton to follow-up in seven days if his symptoms persisted or worsened [*Id.*]. As for the wheelchair, Nurse Townsend did not need to give Clinton a wheelchair because he already had a pass for crutches.

To prevail on a deliberate indifference claim, a plaintiff must satisfy a very high standard: liability under Section 1983 attaches only where a defendant acts with "something approaching a total unconcern for [the plaintiff's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane*, 959 F.2d at 677. Liability does not attach if the defendant is merely negligent, incompetent, unreasonable, or even committing medical malpractice. *See Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000).

Clinton does not come close to meeting this demanding standard. Nurse Townsend's assessment of Clinton on December 26, 2009, was appropriate, within the applicable standard of nursing care, and in no way suggests deliberate indifference to his serious medical needs. Clinton states that he wanted a wheelchair because of the possibility of ice on the ground, but a prisoner "is not entitled to demand specific care . . . [nor] . . . entitled to the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir.1997). Clinton's desire for a wheelchair does not establish that a wheelchair was medically necessary, and thus, Nurse Townsend's failure to provide a wheelchair – especially in light of her examination of Clinton – cannot form the basis of Clinton's Section 1983 claim.

Moreover, Clinton does not assert, and the record does not suggest, that he suffered any actual physical injury or other harm from not being given a wheelchair on December 26, 2009. To prevail in a deliberate indifference case like this one, a plaintiff must demonstrate actual injury caused by the defendant's actions or omissions. *Walker*, 233 F.3d at 502. Clinton has not submitted admissible evidence that a wheelchair was medically necessary or that he suffered harm from not having been given a wheelchair. Accordingly, there is no evidence in the record from which a reasonable factfinder jury could conclude that Nurse Townsend was deliberately

indifferent to Clinton's serious medical needs.

## CONCLUSION

For the reasons set forth above, Defendant Joyce Holland's motion for summary judgment [DE 79] is **GRANTED**, and Defendants Lynn Frye, Karen Cummings, Kimberly Myers, and Sharrie Townsend's motion for summary judgment [DE 83] is also **GRANTED** The Clerk is **DIRECTED** to enter judgment in favor of the Defendants and against the Plaintiff.

**SO ORDERED.**

ENTERED: September 26, 2013

<u>s/ Philip P. Simon</u>
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT